# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

**JEFFREY GATES,**

          **Plaintiff,**

-v-

**BEAU TOWNSEND FORD, INC., et al.,**

          **Defendants.**

**Case No. 3:08-cv-054**

**Judge Thomas M. Rose**

_____

### ENTRY AND ORDER GRANTING BEAU TOWNSEND FORD'S MOTION FOR SUMMARY JUDGMENT (Doc. #28) AND TERMINATING THIS CASE

_____

This matter arises from the employment of Plaintiff Jeffrey Gates ("Gates") by Defendant Beau Townsend Ford, Inc. ("BTF"). Gates's Amended Complaint includes two Claims for Relief. (Doc. #8.) Gates's First Claim for Relief is for age discrimination in violation of the Age Discrimination In Employment Act of 1967 (the "ADEA"), 29 U.S.C. § 621 et seq. His Second Claim for Relief is for wrongful termination in violation of Ohio public policy. Beau Townsend Nissan, Inc. was named as a Defendant in the Amended Complaint but has subsequently been dismissed by Gates with prejudice. (Doc. #9.)

This Court has federal question subject matter jurisdiction under the ADEA. In addition, since Gates is a resident of Ohio and BTF is a Delaware Corporation, this Court has diversity subject matter jurisdiction.

Now before the Court is BTF's Motion for Summary Judgment. (Doc. #28.) This Motion is now fully briefed and ripe for decision. A relevant factual background will first be set forth followed by the standard of review for motions for summary judgment and an analysis of the

Motion.

## RELEVANT FACTUAL BACKGROUND

Gates began his employment with BTF as a "sales and leasing consultant" in 1998. (Deposition of Jeffrey Gates ("Gates Dep.") 12-13 Feb. 3, 2009.) In approximately 2000, Gates became BTF's "Internet Sales Manager." (Id. 14.)

As Internet Sales Manager, Gates was initially only paid a commission on sales. (Id.) A couple of years later, BTF began paying Gates an additional $1,200 per month to manage BTF's connection to the internet and keep it up to date. (Id. 15.)

In early 2007, J.R. Rash ("Rash"), an existing sales person at BTF, was brought into the Internet Sales Department by Jamie Spencer[1] ("Spencer") because Spencer thought Gates needed some help. (Id. 28-29, 37.) Gates was told by Spencer that Gates needed to start giving Rash half of his leads. (Id.) Gates was also told that he was to turn over control of the Internet Sales Department to Rash. (Affidavit of Jeffrey Gates ("Gates Aff.") ¶ 4 Sept. 14, 2009.) In this position, according to Gates, Rash controlled which leads were to be distributed to Gates. (Id.) In addition, Spencer told Gates that Gates needed to split his internet leads with Rash and required that telephone inquiries stemming from the BTF website be distributed to all of the BTF salespeople instead of just Gates. (Deposition of Jamie Spencer ("Spencer Dep.") 36-37 Aug. 4, 2009.)

Rash was designated as Gates's assistant. (Gates Dep. 28.) At the time, Rash was 49 years of age and Gates was 61 years of age. (Spencer Dep. 10-11.)

---

[1]Spencer was BTF's General Manager. (Affidavit of Jamie Spencer ("Spencer Aff.") ¶ 2 Apr. 29, 2009.)

In his Affidavit, Gates says that BTF discontinued paying him a salary of $1,200 per month and paid that money to Rash. (Gates Aff. ¶ 5.) Yet, in his deposition, Gates testified that he was paid the $1,200 per month up until he left except for the week when he went to Cancun. (Gates Dep. 15.) Further, a review of his last paychecks shows that Gates received a salary of $1,200 on May 31, 2007 and a salary of $800 on June 30, 2007. (Gates Dep. Ex. 137, 138.)

Gates also anticipated that his earnings were going to be reduced by over 60% in commissions and bonuses and 12% in salary due to control of the internet sales being given to Rash. (Gates Aff. ¶ 7.) However, Gates provides no Rule 56 evidence that his earnings while at BTF were reduced.

During his employment at BTF, Gates became aware of three practices that he believed were unscrupulous and/or illegal. The first is that BTF was allegedly charging documentation fees on vehicles sold under Ford's AXZ and D plans (collectively referred to herein as the "Plans")[2]. (Gates Dep. 61.) Gates had read on Ford's website that a dealer cannot charge documentation fees on vehicles sold under the Plans. (Id.) When told of this issue by Gates, Larry Taylor[3], BTF's Vice President, allegedly said in a sales meeting that it was his dealership and he was going to charge documentation fees regardless of what Ford said. (Id.)

The second issue that concerned Gates arose in late 2004 or early 2005 when Todd Imwale ("Imwale"), BTF's Finance and Insurance Manager, asked Gates to use Photoshop, a photo editing program, to alter customer payroll records. (Id. 63, 111.) Gates told Imwale that he

---

[2]These Plans allegedly provide discount pricing to Ford employees and their family members. (Gates Dep. 62.)

[3]Taylor owned 30% of BTF and Beau Townsend owned the remaining 70%. (Deposition of Beau Townsend ("Townsend Dep.") 5 May 4, 2009.)

would not alter customer payroll records. (Id. 111.) Imwale responded that he would take care of it. (Id.) The next morning, the documents at issue were on Gates's desk and he thinks the documents were altered.[4] (Id. 111-12.)

The remaining issue that concerned Gates was the advertising and selling of vehicles by BTF as Ford Certified Pre-Owned Vehicles ("CPOVs") which were not certified in compliance with Ford's certified pre-owned program standards. (Id. 55.) Gates allegedly received calls in 2007 from customers who had purchased CPOVs that were missing parts or had problems with the vehicles. (Id. 55.) One customer told Gates that his wife had nearly been killed in an accident in a CPOV because the vehicle had a broken tie rod. (Id. 55-56.) Gates then asked Donn Goff ("Goff"), BTF's Service Director, about whether the CPOVs were going through the 118-point check. (Gates Dep. 56; Deposition of Don Q. Goff ("Goff Dep.") 7 July 20, 2009.) Goff responded that the vehicles were not being certified. (Goff Dep. 13.) According to Gates, Goff said that the used car department was forging the names of the mechanics on the CPOV certifications. (Gates Dep. 56.) Thereafter, Gates refused to market any more used vehicles on the Internet unless they were certified. (Id.)

Gates believed that he was being harassed because of his complaints. He believes that he was being harassed because Rash took his sale's leads off of the fax machine and cut off his telephone so he could not get phone messages. (Gates Dep. 46.) This, however, was done on his day off and was done only once. (Id.46, 49.) Further, when Taylor learned that Gates's phone had been cut off on Gates's day off, he stated, according to Gates, that it "better not ever happen

---

[4]Gates refers to Exhibits 5 through 8 as documents that have been altered but these documents have not been submitted as Rule 56 evidence.

again." (Gates Dep. 49.)

Gates also thought that he was being punished because Jesse Taylor, Taylor's nephew, refused to place vehicle photographs on the internet when requested by Gates to do so. (Id. 57.) At the time, Jesse Taylor allegedly told Gates that "you're not running the show now'" "you're too old, [Rash] is running the show now," and "I take my orders from [Rash]". (Id.) According to Gates, Jesse Taylor was Taylor's nephew and a "go-pher" and "do-it-all" for Taylor. (Id. 88.)

Gates thinks that Taylor and Rash were conspiring to get rid of him. (Id. 84.) This is because, one time, Rash was sitting in Taylor's office and Gates was called in and told by Taylor that Gates was not being a team player. (Id. 85.) Gates also testified that "sometimes" he would go in the office and Rash was showing Taylor "things on the computer and stuff." (Id.)

On June 20, 2007, Gates, while still employed by BTF, submitted a job application to, and interviewed with, Joseph Airport Toyota. (Gates Dep. 122-23, Ex. D; Deposition of Christian Hahn ("Hahn Dep.") 10 Feb. 4, 2009.) According to Christian Hahn, the General Sales Manager of Joseph Airport Toyota, Gates was made an offer to be the Internet Sales Manager for Joseph Airport Toyota on June 21, 2007, and Gates accepted that offer on June 21, 2007. (Hahn Dep. 14-17.) Also, on June 21, 2007, Gates signed a pay plan agreement with Joseph Airport Toyota. (Hahn Dep. 16-17, Ex. J.) Gates testifies that he signed a letter of intent on June 21, 2007, to hold the job open and that he was going to think about a new job while on vacation in Cancun. (Gates Dep. 70-71.)

On June 24, 2007, Gates left for vacation in Cancun. (Gates Dep. 123.) Before he left for Cancun, Gates cleaned out his office completely and took all of his personal items home in boxes. (Id. 78, 123.)

After returning from Cancun on July 8, 2009, Gates himself did not contact anyone at BTF. (Id. 79.) However, Jamie Gates, his nephew, informed him that when he visited BTF while Gates was on vacation, he was told that Gates no longer worked there. (Id. 80.) He was told this same thing by two other customers. (Id.) On July 9, 2007, Cheryl Gates, Gates's wife, called BTF and asked to speak to Gates. (Affidavit of Cheryl Gates ¶ 3 Sept. 10, 2009.) She was told that Gates no longer worked there. (Id.) Finally, on July 10, 2009, Gates found that his picture was no longer on BTF's website. (Gates Dep. 80-81.)

No one from BTF ever told Gates verbally or in writing that his employment was terminated. (Gates Dep. 92.) He did, however, get a letter saying that his benefits were terminated as of June 30th. (Id.) Yet, Gates affirms that he, at no time, resigned from BTF and that he was scheduled to return to work at BTF when he returned home from Cancun. (Gates Aff. ¶¶ 3, 8.)

According to Spencer, Gates was at no time terminated or discharged from his employment at BTF. (Spencer Aff. ¶ 7.) Also according to Spencer, on or about June 23, 2007, Gates removed everything from his office and left for vacation without giving any notice. (Id. ¶ 8.) Gates never physically returned to BTF. (Id.)

Beau Townsend ("Townsend") was told that Gates quit and had been hired by Joseph Airport Toyota so he called Gates and asked him to return to BTF. (Id. 25.) Gates met with Townsend on two occasions. (Gates Dep. 83.) Gates told Townsend about the alleged issues with the CPOV program and the alleged issues involving documentation fees. (Id. 83-84.) Gates also told Townsend that he would return to BTF only if Taylor and Spencer were no longer there. (Id. 83-84.) Townsend passed these concerns along to Taylor but does not know what became of

them. (Townsend Dep. 28-29, 37.) Townsend also says that Gates wanted $600,000 to come back to work. (Id. 35.) Gates did not return to employment with BTF and subsequently filed this lawsuit.

## STANDARD OF REVIEW

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and the associated caselaw. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for

trial." *Anderson*, 477 U.S. at 250 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S. at 324.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S. at 255. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, §2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

However, the mere existence of a scintilla of evidence in support of the nonmoving party is not sufficient to avoid summary judgment. *Anderson*, 477 U.S. at 252. "There must be evidence on which the jury could reasonably find for the plaintiff." *Id.* The inquiry, then, is whether reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not …obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989), *cert. denied*, 494 U.S. 1091 (1990). Thus, in determining whether a genuine issue of

material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties. The Rule 56 evidence includes the verified pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits submitted. Fed. R. Civ. P. 56(c).

## AGE DISCRIMINATION

Gates claims that BTF discriminated against him in violation of the ADEA. BTF seeks summary judgment on this claim arguing that Gates cannot satisfy his burden of proof regarding his ADEA claim.

The ADEA provides, in part, that it is unlawful for an employer to refuse to hire or to discharge an individual because of the individual's age. *Merkel v. Scovill, Inc.*, 787 F.2d 174, 177 (6th Cir. 1986), *cert. denied*, 479 U.S. 990 (1986). The ultimate issue in an age discrimination action is whether the plaintiff can prove by a preponderance of the evidence that age was the "but-for" cause of the adverse employment action. *Gross v. FBL Financial Services, Inc.*, 129 S. Ct. 2343, 2345 (2009).

If the plaintiff presents direct evidence of age discrimination, the plaintiff must prove that age was the "but-for" cause of the alleged employer decision. *Geiger v. Tower Automotive*, 579 F.3d 614, 621 (6th Cir. 2009). However, if the plaintiff presents circumstantial evidence of age discrimination, the Sixth Circuit uses the *McDonnell-Douglas* burden-shifting framework to analyze the claim. *Id.* at 622.

Direct evidence is evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's decision. *Id.* (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003)). Circumstantial evidence is

"proof that, on its face, does not establish discriminatory animus but does allow a factfinder to draw a reasonable inference that discrimination occurred." *Id.*

In this case, Gates does not present direct evidence of age discrimination. Further, both Parties apply the *McDonnell-Douglas* burden-shifting framework to their arguments. Therefore, the Court will apply the *McDonnell-Douglas* burden-shifting framework to Gates's allegations.

Under the *McDonnell-Douglas* framework, the plaintiff has the initial burden of establishing a prima facie case. *Id.* at 252-53. If the plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its action. *Id.* at 253. If the employer articulates a legitimate, non-discriminatory reason for its action, the burden then shifts to the plaintiff to prove that the legitimate, non-discriminatory reason is a pretext for discrimination. *Id.*

To establish a prima facie case of age discrimination pursuant to the ADEA in this situation, an employee must show:

1. The employee was a member of the protected class; and

2. The employee was subjected to an adverse employment action; and

3. The employee was qualified for the particular position; and

4. The successful applicant was a substantially younger person.

*Geiger*, 579 F.3d at 622; *Godfredson v. Hess & Clark, Inc.*, 173 F.3d 365, 371 (6th Cir. 1999). In this case, BTF argues that Gates cannot establish a prima facie case so the elements of a prima facie case must be analyzed.

**Prima Facie Case of Age Discrimination**

1. Member of the Protected Class

The ADEA prohibits discrimination against persons on the basis of age who are forty (40) years of age or older. Gates was born in 1946. (Spencer Dep. Ex. 1.) Thus, Gates was sixty-one (61) years of age when he left BTF.

Gates was a member of the class protected by the ADEA. The first element of a prima facie case is satisfied.

### 2. Subjected To Adverse Employment Action

In this case, Gates alleges that he was terminated or constructively terminated by BTF, both of which are adverse employment actions. BTF, on the other hand, argues that Gates quit his job at BTF.

There is undisputed evidence that Gates packed up all of his personal belongings and cleaned out is office before he left BTF on vacation. There is also undisputed evidence that Gates applied for employment and discussed employment with Joseph Airport Toyota before he left on vacation. There is also undisputed evidence that Gates never returned to BTF after returning from vacation. In addition, there is undisputed evidence that management at BTF thought Gates had quit employment there and that BTF terminated Gates's benefits as of June 30, 2007. Finally, there is undisputed evidence that Gates told Townsend that he wanted $600,000 to return to work at BTF.

Gates says that he signed a letter of intent to Joseph Airport Toyota before he left on vacation, was going to consider changing jobs while on vacation and never quit his job at BTF. However, Joseph Airport Toyota has not produced a letter of intent and neither has Gates. What has been produced is a Joseph Airport Toyota pay plan signed by Gates. Further, the individual responsible for hiring Gates at Joseph Airport Toyota says that Gates was presented with a pay

plan and accepted a position there before he left for vacation. Gates ended up working for Joseph Airport Toyota.

From this evidence, no reasonable jury could find that Gates was subjected to an adverse employment action by BTF. Gates's evidence and argument does not satisfy the second element of a prima facie case of age discrimination. However, Gates also argues that he was constructively discharged.

A constructive discharge occurs if "working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign." *Yates v. Avco Corp.*, 819 F.2d 630, 636-37 (6th Cir. 1987)(citing *Held v. Gulf Oil Co.*, 684 F.2d 427, 432 (6th Cir. 1982)). To show constructive discharge, an employee must present evidence that (1) the employer deliberately created intolerable working conditions as perceived by a reasonable person and (2) the employer did so with the intention of forcing the employee to quit. *Logan v. Denny's, Inc.*, 259 F.3d 558, 568-69 (6th Cir. 2001)(citing *Moore v. KUKA Welding Systems & Robot Corp.*, 171 F.3d 1073, 1080 (6th Cir. 1999)). Thus, both the employee's objective feelings and the employer's intent must be examined. *Id.* at 569 (citing *Held*, 684 F.2d at 432).

The following factors are considered when determining whether the employer deliberately created intolerable working conditions: (1) demotion; (2) reduction in salary; (3) reduction in job responsibility; (4) reassignment to menial or degrading work; (5) reassignment to work under a younger supervisor; (6) badgering, harassment, or humiliation by the employer calculated to encourage the employee's resignation; or (7) offers of early retirement or resignation or continued employment on terms less favorable than the employee's former status.

*Id.* Finally, proof of discrimination alone is not a sufficient basis for a finding of constructive discharge. *Yates*, 819 F.2d at 637. There must be other aggravating factors. *Id.*

Gates identifies evidence regarding the second factor. There is also evidence regarding the sixth factor. Thus, both will be considered.

Regarding a reduction in salary, Gates argues that there is evidence that he could reasonably anticipate that his earnings would be reduced by Rash's control over the disbursement of sales leads from BTF's website. He also argues that he no longer received his $1,200 per month salary for internet management after Rash was assigned to the Internet Sales Department.

Gates has not presented evidence that his salary was reduced, only that he thought it might be. Further, regarding the disbursement of sales leads, Gates was getting all of the sales leads from the internet and, as a result, some of the internet customers were not being serviced. Taylor made the business decision to disburse these sales lead to all of BTF's salespeople. Finally, the evidence does not show that Gates no longer received the $1,200 per month salary for internet management. Thus, a reasonable jury could not find that a possible future salary reduction in this situation is an indication that BTF deliberately created intolerable working conditions with the intent of forcing Gates to quit.

Regarding harassment, the only evidence presented by Gates is that his sales leads were taken off the fax machine and his telephone was cut off; that Jesse Taylor told him that he was too old and that Rash was running the show; that, one time, Rash was sitting in Taylor's office and Gates was called in and told by Taylor that Gates was not being a team player; and that "sometimes" he would go in the office and Rash was showing Taylor "things on the computer

and stuff." However, these alleged instances do not rise to the level of harassment necessary to make working conditions so difficult or unpleasant that a reasonable person in the Gates's shoes would have felt compelled to resign. His sales leads were taken off the fax machine and his office telephone was cut off only once and that was on his day off. Jesse Taylor was, by Gates's own admission, merely a "go-pher" and "do-it-all" and anything allegedly said by him should have had little value, and, in addition, is hearsay. Being told on one occasion that he was not a team player also hardly rises to the level of harassment due to age. Finally, the fact that Rash may have been showing Taylor "stuff" on the computer also does not rise to the level of harassment.

Gates has not shown that BTF deliberately created intolerable working conditions as perceived by a reasonable person and did so with the intention of forcing the employee to quit. Therefore, Gates has not shown that he was constructively discharged.

Gates has not shown that his employment was terminated or that he was constructively discharged. He, therefore, has not presented evidence that he was subjected to an adverse employment action. There are no genuine issues of material fact and Gates has not satisfied the second element of a prima facie case of age discrimination.

### 3. Qualified for the Position

Gates argues that he was qualified for the Internet Sales Department position. This is confirmed by Townsend (Townsend Dep. 18, 22, 41-42.) Also, this is not disputed by BTF. Therefore, Gates has satisfied the third element of a prima facie case of age discrimination.

### 4. Successful Applicant Was Substantially Younger Person

There is no evidence that Gates was replaced, within the meaning of the relevant law, by

anyone when he left BTF. *Grosjean v. First Energy Corp.*, 349 F.3d 332, 336 (6th Cir. 2003)(a plaintiff is not replaced when another employee is assigned to perform the plaintiff's duties in addition to other duties or when the work is redistributed among other existing employees already performing related work), *cert. denied*, 541 U.S. 1010 (2004).

Gates's argument regarding this factor is that he was replaced by Rash while he was still at BTF. However, when Gates left BTF, Rash was left performing Gates's duties in addition to his own and Rash was also already performing the same type of work.

Gates argues that, because Rash was substantially younger, the fourth element is satisfied. While Rash may have been substantially younger than Gates, Rash did not replace Gates in accordance with the governing law. Therefore, there are no genuine issues of material fact and Gates has not satisfied the fourth element of a prima facie case of age discrimination.

In sum, there are no genuine issues of material fact and Gates has not identified evidence that satisfies two of the four elements of a prima facie case of age discrimination. But, there is more.

## Legitimate, Non-Discriminatory Reason

Next, BTF must articulate a legitimate, non-discriminatory reason for its adverse employment decision. The age discrimination claimed by Gates is the termination of his employment due to his age. BTF does not articulate a legitimate, non-discriminatory reason for terminating Gates's employment and, instead, says that it did not terminate Gates's employment.

## Pretext for Discrimination

Gates must now show that BTF's explanation is a pretext for discrimination. To do so, Gates argues that: (1) there is objective evidence that his employment was terminated by BTF;

(2) BTF's internet sales were not growing tremendously at the time that Rash was placed in the position of Internet Sales Manager; and (3) Jesse Taylor's statement that Gates was too old echoed the sentiment of management. However, all of these arguments are without merit.

First, as determined above, BTF did not terminate Gates, constructively or otherwise. Gates found another job at Joseph Airport Toyota and quit his job at BTF.

Second, BTF did not say that its internet sales were growing tremendously. Spencer, BTF's Sales Manager, said that he added Rash to BTF's Internet Sales Department because "the internet was growing tremendously." (Spencer Dep. 38-39.) There is a large difference between the internet growing tremendously and BTF's internet sales growing tremendously. Also, while Gates argues that there is no evidence that he ever requested any assistance or was unable to meet the demands of the position, Spencer testified that Gates was "dealing with too many customers and was unable to handle the traffic." (Spencer Dep. 36-37.)

Third, while Jesse Taylor was Taylor's nephew, even Gates knew that Jesse Taylor was "go-pher" and "do-it-all." A reasonable person in Gates's shoes would not have concluded that Jesse Taylor was echoing the sentiments of management.

## Conclusion

Therefore, even if Gates could identify evidence to satisfy all of the elements of a prima facie case of age discrimination, which he has not, he has also not shown that any action by BTF was a pretext for age discrimination. He has not shown that, but-for his age, his employment would not have been terminated. There are no genuine issues of material fact and BTF is entitled to judgment as a matter of law on Gates's ADEA claim.

## WRONGFUL TERMINATION

Gates claims that he was terminated in violation of Ohio public policy. Specifically, he argues that he was terminated because he opposed and refused to engage in BTF's alleged practices of: (1) advertising and selling vehicles as CPOVs which were not inspected for safety and quality in compliance with Ford Motor Company's certified pre-owned program standards; (2) altering customer payroll documents which are submitted for the purpose of showing proof of income in order to obtain vehicle financing; and (3) charging unauthorized fees to customers purchasing vehicles under Ford's AXZ and D plans.

BTF responds that Gates cannot establish a claim for wrongful termination in violation of Ohio public policy because he cannot show that his employment was terminated and because he cannot demonstrate a clear public policy that his termination would violate.

Public policy warrants an exception to the employment-at-will doctrine when an employee is discharged or disciplined for a reason prohibited by Ohio public policy. *Kulch v. Structural Fibers, Inc.*, 677 N.E.2d 308, 320 (Ohio 1997)(citing *Greeley v. Miami Valley Maintenance Contractors, Inc.*, 551 N.E.2d 981 (Ohio 1990)), *cert. denied*, 522 U.S. 1008 (1997). Thus, Ohio provides for a private cause of action sounding in tort for wrongful discharge where the discharge is in contravention of a clear public policy. *Greeley*, 551 N.E.2d at 986. The clear public policy may be found in the United States and Ohio Constitutions, in legislation, in administrative rules and regulations and in the common law. *Painter v. Graley*, 639 N.E.2d 51, 56 (Ohio 1994).

To establish a claim for wrongful termination in violation of Ohio public policy, a plaintiff must prove all of the following:

> 1. That a clear public policy existed and was manifested in a state or federal constitution, statute or administrative regulation, or in the common law (the

clarity element); and

2. That dismissing an employee under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy (the jeopardy element); and

3. The plaintiff's dismissal was motivated by conduct related to the public policy (the causation element); and

4. The employer lacked overriding legitimate business justification for the dismissal (the overriding justification element).

*Collins v. Rizkana*, 652 N.E.2d 653, 657 (Ohio 1995). The clarity and jeopardy elements are questions of law for the court and the causation and overriding justification elements are questions of fact for the jury. *Id.* at 658. Thus the clarity and jeopardy elements must be examined by the Court.

## The Clarity Element

To satisfy this element, Gates must show that a clear public policy existed. Yet, employee who does not comply with the requirements of the whistleblower statute cannot base a wrongful termination claim solely upon public policy. *Kulch*, 677 N.E.2d at 322-23. Thus, courts have not permitted wrongful termination claims when the employee does not comply with the requirements of the whistleblower statute unless the clear public policy itself places an affirmative duty on the employee, separate from the whistleblower statute, to report the violation or when the clear public policy prohibits the employer from retaliation. *See Dean v. Consolidated Equities Realty #3, LLC*, No. C-080931, 2009 Ohio App. LEXIS 2114 at *7 (Ohio Ct. App. May 29, 2009); *Gossett v. Byron Products, Inc.*, 407 F. Supp.2d 918, 924 (S.D. Ohio 2005); *Hale v. Volunteers of America*, 816 N.E.2d 259, 268-69 (Ohio Ct. App. 2004); *Evans v. PHTG*, No. 2001-T-0054, 2002 WL 1401476 at *4-6 (Ohio Ct. App. June 28, 2002). Courts have

also permitted wrongful termination claims when the employee was terminated for refusal to violate criminal statutes. *See Tracy v. Northrup Grumman Systems* Corp., No. 1:02cv126, 2009 WL 690255 at *4 (S.D. Ohio Mar. 12, 2009); *Anders v. Specialty Chemical Resources, Inc.*, 700 N.E.2d 39, (Ohio Ct. App. 1997); *Merkel v. Scovill, Inc.*, 573 F. Supp. 1055 (S.D. Ohio 1983). Thus, the clear public policy, if separate from the whistleblower statute, must parallel the whistleblower statute or be criminal in nature. *Id.*

In this case, there is no evidence that Gates complied with the whistleblower statute. Thus, he must identify sources of public policy that place an affirmative duty on him to report the violation of the clear public policy or a clear public policy that includes a prohibition on retaliation or that is criminal in nature. He suggests three such public policies. However, none of those identified place an affirmative duty upon him to report violation or include a prohibition on retaliation but one of them involves a statute that is criminal in nature.

Regarding sale of the CPOVs, Gates cites O.R.C. 1345 and the case of *Zajc v. Hycomp, Inc.*, 873 N.E.2d 337 (Ohio Ct. App. 2007), as sources of the public policy. However, O.R.C. 1345 includes no provision placing an affirmative duty on Gates to report violations thereof, does not include a prohibition on retaliation for reporting violations and is not criminal in nature. Also, *Zajc* involved a case where the plaintiff, who was permitted to proceed with a wrongful-termination-in-violation-of-Ohio-public-policy claim was entrusted with inspection duties by the law in question and thus had a duty under that law.

Regarding the alleged altering of customer payroll records, Gates cites 18 U.S.C. § 1344 and the cases of *Anders v. Specialty Chemical Resources, Inc.*, 700 N.E.2d 39, (Ohio Ct. App. 1997) and *Merkel v. Scovill, Inc.*, 573 F. Supp. 1055 (S.D. Ohio 1983), for the source of clear

public policy. While 18 U.S.C. § 1344 is a criminal statute that makes bank fraud illegal, it includes no provision placing an affirmative duty on Gates to report violations thereof and does not include a prohibition on retaliation for reporting violations. However, employment of the plaintiff in *Anders* was terminated because he did not perform an act that would violate a criminal law. The *Anders* court found this to be a violation of clear public policy. The *Merkel* court also confirmed that clear public policy was violated when an employee was asked to violate a criminal statute. Thus, Gates has identified a clear public policy, 18 U.S.C. § 1344, based upon which the common law says he may bring a claim for wrongful termination.

Regarding the documentation fees charged by BTF, Gates cites O.R.C. § 134 for the source of clear public policy. However, as determined above, O.R.C. 1345 includes no provision placing an affirmative duty on Gates to report violations thereof, does not include a prohibition on retaliation for reporting violations and is not criminal in nature. Therefore, this statute cannot serve as a source of clear public policy for Gates's wrongful termination claim.

### The Jeopardy Element

Under this element, Gates must show that he was dismissed under circumstances that would jeopardize public policy. However, as determined above, Gates's employment was not terminated, constructively or otherwise. Therefore, Gates cannot satisfy this element.

BTF argues that it must have and did not receive notice that they were dealing with someone who was invoking a governmental policy. *See Jermer v. Siemens Energy & Automation, Inc.*, 395 F.3d 655, 656 (6th Cir. 2005). However, there is evidence from which a reasonable person could infer that Gates informed BTF that he would not commit bank fraud.

### Conclusion

Gates's claim that his employment was terminated for refusing to alter payroll records satisfies the Clarity Element. The others do not. However, none of Gate's claims satisfy the Jeopardy Element because his employment was not terminated, constructively or otherwise. Thus, BTF is entitled to judgment as a matter of law on Gates's claim that he was wrongfully terminated in violation of Ohio public policy.

## SUMMARY

Gates has not identified evidence to satisfy all of the elements of a prima facie case of age discrimination and he has also not shown that any action by BTF was a pretext for age discrimination. Thus, there are no genuine issues of material fact and BTF is entitled to judgment as a matter of law on Gates's First Claim for Relief for age discrimination in violation of the ADEA.

None of Gate's claims satisfy the Jeopardy Element of a claim for wrongful discharge in violation of Ohio public policy because his employment was not terminated, constructively or otherwise. Thus, BTF is entitled to judgment as a matter of law on Gates's Second Claim for Relief for wrongful termination in violation of Ohio public policy.

BTF's Motion for Summary Judgment (doc. #28) is GRANTED. No claims remain to be adjudicated. Therefore, the captioned cause is hereby ordered terminated upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE and ORDERED** in Dayton, Ohio this Twenty-Fourth day of November, 2009.

**s/Thomas M. Rose**

_____

THOMAS M. ROSE
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record